Thank you, Judge Thomas. Thank you. I'm going to please the court. My name is Mark Caldwell. I'm representing Mr. Trevizo on this morning's Social Security Disability claim. Again, I will keep track of it in time, but I'm going to try to reserve about five minutes before we vote. We had four issues in this case. Unless there are any questions about the third and the fourth issues, we can move. Should this court be persuaded by the first two, I'm going to focus on the first two. In the first two, I would urge you to actually look at the sentence notes of the doctor, as we spoke about, who is the treating physician and the agency's own vocational expert. Who said that those notations would preclude work. And I will again argue that the clarity of that substandard should apply here, because the agency relied on substantial evidence that contradicted Dr. Calder's opinion. But under any standard, the reasons the ALJ gave were insufficient. And, secondly, Chris, the ALJ argued that the activities of Jamie Lemon, from Mr. Trevizo, contradicted Dr. Calder's opinion. But she gave no convincing connection between those activities and the ability to sustain work on a regular and continuing basis, which is the insurance burden. Then, let me go back. The three things that I saw, her childcare, walking, and birth of her children, those activities do not add up to eight hours a day, five days a week, or an equivalent work schedule. So, it's a lot like watching TV or these other types of activities. We simply don't know what's involved in terms of exertion requirements, duration, frequency, etc. The only other thing that the ALJ relied upon to reject Ms. Trevizo's opinion were findings on musculoskeletal examinations. In other words, Ms. Trevizo did not have degenerative joint disease, but she did have arthropathy connected with the sclerotic arthritis. The two don't have anything to do with each other. Dr. Agro, the treating dermatologist, the specialist regarding this malady, repeatedly said that Ms. Trevizo suffered from sclerotic arthropathy. That explains the need, regardless of the moral findings, of degenerative disc disease. To use the phrase, it's apples and oranges. So, that rationale from the ALJ fails to rebut Dr. Coulter's treating source medical opinion. And so, if there's a lot to say here, since the vocational experts said that those assessed limitations would preclude the ability to perform any sustained work, then that opinion should be accepted. As a matter of law, coupled with the vocational experts that have not predicted or contested testimony, there should be a piece of service court to remake the further proceedings without forcing Ms. Trevizo to undergo further administrative proceedings. Wait, if you just said, we can't do further proceedings without requiring Ms. Trevizo to go through further association? I perhaps said that in arthropathy. The further proceedings should be calculation of benefits, not putting this blade through the bureaucratic meat grinder, yet again, to go before an ALJ, and so respectfully, cavalierly, to treating physicians' opinion. So, when I said, again, in arthropathy, further proceedings, I meant that those further proceedings should be for worker benefits, not for substantive administrative proceedings. There was a vocational expert who asked the question, would they call limitations as determined by the treating physician in this case? Yes, word for word. In the transcripts of the treaty, there's five to seven. So, since these were, again, defined limitations, these are not general statements of disability, and the hearing attorney specifically said to the vocational expert, assume these defined limitations. The vocational expert said, a person with those limitations may not perform any work. I respectfully submit that this court should at that point say, since there are no reasons for further administrative proceedings, and the informationary hasn't given any persuasive arguments that there should be, that this court's determination should end there. But, we have another reason for this court to accept evidence and remain arthropathic proceedings, and that's Mr. Dezo's sentient testimony, vocational expert said, again, in five to seven, that a person with those limitations could not sustain work. Now, let me make it clear, the vocational expert was not asked to assume a testimony, per se. The vocational expert was asked, assume a person had to take unscheduled breaks. Well, on the face of it, Mr. Dezo said, because of this horrible, seratic arthritis where the skin is flaking off the floor, and sometimes there's 85% of her body, I have to take a shower three times a day. That's what skin can bring. So, again, we have a vocational expert, the agency's vocational expert, giving an uncontradicted testimony that the limitations from Mr. Dezo's second testimony, would be work preclusors. Now, what did the LGA mean with that? The LGA said that, well, there's inconsistencies in the record, because she reports fatigue, and sometimes she doesn't report fatigue. One instance, out of this entire record, did Mr. Dezo say, on that day, you're not having fatigue? One instance. The LGA also said, for personal compliance with treatment, throughout this record, you just documented that Mr. Dezo did not have insurance. Sometimes she did, sometimes she didn't. But mostly, when you see these doctors prescribing this extremely powerful medication, you see them giving samples of it. The medications themselves are horrific. Methotrexate, Cimeric, Remicade. As I say in my brief, getting one of those medications reduces the immune system, and makes the person susceptible to incredible opportunistic diseases, even death. So, the LGA went on to say, acting as a doctor, not an administrative adjudicator. Well, this person should be on narcotics. Really? How many cases have we seen where people become addicted to narcotics? The LGA was not in a position, acting as an administrative adjudicator, not a doctor, to suggest that Mr. Dezo should be on narcotics. But when we compare that to what are called the biologic agents, the intermittent process factors, then she was prescribed. Because these are such powerful medications, as I documented in my brief, that in and of itself contributes to, as a detractor, the severity of Mr. Dezo's symptoms. And then we come to what we were talking about, the priorities. Administrative activities to be delivered. And there's actually no connection between those activities and the ability to sustain work activities. So since there's no connection, simply reciting, almost spoiler plate type language, that activities that claim daily living are inconsistent with the claimant's symptom testimony does nothing to detract from the claimant's symptom testimony in the lack of a connection between the reported, the extensively reported daily activities and the ability to sustain work. May I reserve the floor? Thank you. Jeff Staples Good morning. May it please the Court, Jeff Staples on behalf of the Commissioner, who asks that you affirm the District Court's judgment because the ALJ's decision is supported by substantial evidence. I think it's fair characterization to say that the ALJ's analysis is pervaded by a discussion of Mr. Dezo's child care activities. Now, Mr. Dezo is not just watching one kid for like an hour a day. Mr. Dezo adopted two young children during the period that she claimed to be disabled. During that time, she also took in at least four foster children, also very young, and she testified that she was providing care for those children. Not only did she testify that she was providing care for them, she also testified that she received a medical certification to her capacity to care for the adopted children from a doctor. She also testified that she underwent review from the foster board. So Mr. Dezo's ability to perform care for these at least six children on a regular and continuing basis undermines her claims that she's unable to work, as well as Dr. Galotra's similar opinion. So the ALJ discounted Ms. Trevizo's subjective statements on that basis, because she said that the combination of her psoriatic arthropathy and back pain and joint pain precluded her from working, yet she was able to care for so many children of such young ages for such a long time. So the ALJ reasonably considered that evidence in finding her symptom testimony less than fully credible. The ALJ also looked at Dr. Galotra's opinion that Ms. Trevizo was unable to sustain work over a full eight-hour day, and the ALJ compared that with Ms. Trevizo's ability to care for several very young children over not just an eight-hour day, but all day, every day, for most of the period at issue. The ALJ also discounted the moderate concentration, persistence, and pace limitations for similar reasons, and also that Ms. Trevizo was able to work despite her IQ for several years. Which brings me to the ALJ's zip core finding. The ALJ concluded that the totality of the limitations that Ms. Trevizo had credibly established did not preclude her from returning to her past work as a security guard. The ALJ said that she could do this work as it's generally performed, as it's described in the dictionary of occupational trials, but also as it was actually performed as she described it. And it's important to take a look at how she described that work. She described that work as, this is at ER 139, just sit in my car and make sure no one was on the site. She essentially sat or stood at will in her car looking at a job site. So the ALJ reasonably considered the rest of the record, including Ms. Trevizo's ability to perform childcare, and concluded that that showed that she was able to return to that work despite her statements and Dr. Galotra's opinion to the contrary. Because substantial evidence supports the ALJ's conclusions, the court should affirm. Thank you, counsel. Counsel, could you start with responding to Mr. Gable's argument that the ALJ's opinion, or his analysis, pervaded with the thought that Clay was able to care for his six children? Yes. My first response is a question. Our parents were disabled. Do you rule that that exists? Is there evidence of that? Is there a difference between a parent and someone that they have staged a suicide, seems to take on the responsibility of bringing something into their home? Well, God bless her, but the point is that she testified babies come in and out of my home. She also had, I believe, a homicide. She and her husband, we don't know the extent of hope that she received her. We don't know the extent of the intentional activities involved. But we do know, apparently, that the foster children brought her to the home. I'm assuming that there was some review by authorities who administered those programs to check out the suitability of the house. Sure. And what does that mean? Is there any indication of what that certification means? I mean, we take an EKG, we look at your ears, we look at your eyes, we don't know what that certification means. I assume it means you don't have some sort of chronic health condition that would preclude the ability to engage in child care activities. But again, since we don't know what that means, it is not a clear and convincing standard reason for rejecting the claimants' testimony. And even the ALJ at 39 said she had a foster child for about a year. She had another child for about a year. She had another child for, quote, not too long. She fostered his other children for a short while. What do we know at home that says about the comparison to the ability to sustain work on a regular and continuing basis? It doesn't. Because we don't know the extent of those activities, and there is no evidence of the extent, duration, frequency of what's involved. I grant you that is in the record, but there's no evidence as to how that contradicts Ms. Treviso's testimony. And then we look at the clinical evidence in this case of the horrible flares that Ms. Treviso had from the cirrhotic arthritis, and we have to ask ourselves, how could that possibly be consistent with the ability to perform on a regular and continuing basis? Especially, as I repeat, with these tremendous drugs, with these incredible flares. And I grant you they are flares that go up and down, but that doesn't compare again to the ability to sustain work. And Ms. Treviso testified, and one of the reasons I can't work is I'm shamed. I walk into a workplace, I walk into a restaurant, and people move away from me because skin is flaking off my body because of this miserable condition. That same problem would exist in the workplace. So even though, as the commissioner has focused, almost exclusively focused, on child care activities, that in and of itself is not a reason to discount the symptom testimony that once again, even if we don't go anywhere else, establishes disability. And of course, even if we don't go there, we have a treating physician who gave stable limitations on what his results seem to be, and there's a better outcome. So how do you analyze the DOT listing of foster care as a semi-skilled activity? There is no indication. I agree that the DOT says that there's no indication that Ms. Treviso conducted her activities in the way that the DOT describes that job. If there was evidence that her actual activities matched that job, then we might have a different discussion here. But there's no evidence at all that just because a book that was written in 1991 says that a human child caretaker engages in various activities means that Ms. Treviso was engaged in those activities. So a book doesn't tell us anything about what was actually happening in Ms. Treviso. So that's why the commissioner's emphasis on this method is so misplaced. Any other questions? Any re-arguments? Can you just let me spend it for a decision?
judges: Thomas, Wardlaw, Morris